UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| THOMAS W. HUNT, SR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:20-cv-00160-JAW |
| | ) | |
| THOMAS W. HUNT, JR., et. al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON DEFENDANT JANE A. TRUDEAU'S AND DEFENDANT
THOMAS W. HUNT, JR.'S MOTIONS TO DISMISS**

A Massachusetts man died without a will, without a spouse or children, leaving behind a substantial estate. His father is a Mainer. The son's estate is going through probate in Massachusetts. After renouncing his claim to the estate and his role as personal representative, the decedent's father brought suit in Maine against his other son, a Rhode Island resident, and against a Massachusetts attorney, the father's former sister-in-law, alleging they wrongfully induced him to renounce his claim to the estate.

Both defendants move to dismiss the case claiming (1) the Court lacks personal jurisdiction over them and (2) the lack of subject matter jurisdiction and federal abstention doctrines counsel in favor of dismissing or staying this case. The Court concludes that it lacks personal jurisdiction over the Massachusetts attorney and dismisses the plaintiff's claims against her, but it also concludes that it has personal jurisdiction over the Rhode Island son. The Court also concludes it is without subject matter jurisdiction over some of the plaintiff's claims against the Rhode Island son

because adjudication would require the Court to interfere with the Massachusetts probate court's custody over the estate.   The Court dismisses those claims but concludes it has jurisdiction over the plaintiff's remaining claims against his son.

## I.    PROCEDURAL HISTORY

On March 6, 2020, Thomas W. Hunt, Sr. filed a complaint against Thomas W. Hunt, Jr. and Jane A. Trudeau in Cumberland County Superior Court in Portland, Maine.[1]  *Aff. of Elizabeth G. Stouder*, Attach. 2, *Compl.* (ECF No. 13).   On March 16, 2020, Plaintiff Hunt amended his Complaint.  *Id.*, Attach. 5, *First Am. Compl.* (*Am. Compl.*).   Service of the process took time but was eventually completed.  *See generally id.*, Attachs. 8-16.

On May 7, 2020 Defendant Hunt removed the case to the federal district court for the District of Maine pursuant to 28 U.S.C. § 1441, citing the Court's diversity jurisdiction under 28 U.S.C § 1332.  *Notice of Removal* (ECF No. 1).   Defendant Hunt filed his answer to the amended complaint on May 12, 2020.  *Answer* (ECF No. 4) (*Hunt Answer*).   On June 1, 2020 Jane Trudeau moved to dismiss for lack of personal jurisdiction and on the basis of federal abstention doctrines.  *Def. Trudeau's Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1)* (ECF No. 14) (*Trudeau Mot.*).   On June 16, 2020, Defendant Hunt filed his own motion to dismiss for lack of personal jurisdiction and abstention, incorporating Ms. Trudeau's motion by reference.  *Mot. to Dismiss by Def. Thomas W. Hunt, Jr.* (ECF No. 26) (*Hunt Mot.*).   The Magistrate

---

[1]    To distinguish between Thomas W. Hunt, Sr., the father, and Thomas W. Hunt, Jr., the son, the Court has generally referred to the father as Plaintiff Hunt and the son as Defendant Hunt.

Judge authorized jurisdictional discovery later that day. *Procedural Order* (ECF No. 27).

On September 3, 2020, Thomas Hunt, Sr. filed his opposition to the Defendants' motions. *Pl. Thomas W. Hunt, Sr.'s Opp'n to Def. Jane A. Trudeau's and Def. Thomas W. Hunt, Jr.'s Mots. to Dismiss for Lack of Personal and Subject Matter Jurisdiction* (ECF No. 36) (*Pl.'s Opp'n*). On September 17, 2020, the Defendants filed separate replies. *Def. Trudeau's Reply to Pl.'s Opp'n to Mot. to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1)* (ECF No. 39) (*Trudeau Reply*); *Reply to Pl.'s Resp. to Mot. to Dismiss by Def. Thomas W. Hunt, Jr.* (ECF No. 40) (*Hunt Jr. Reply*).

## II.  MOTION TO DISMISS:  ANALYTIC APPROACHES

### A.  The Motion to Dismiss for Lack of Personal Jurisdiction

The Defendants have moved this Court to dismiss the Plaintiff's Amended Complaint for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). "To hear a case, the court must have personal jurisdiction over the parties, 'that is the power to require the parties to obey its decrees.'" *Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 8 (1st Cir. 2009) (quoting *United States v. Swiss Am. Bank, Ltd.*, 191 F.3d 30, 35 (1st Cir. 1999)). "On a motion to dismiss for want of personal jurisdiction, the plaintiff ultimately bears the burden of persuading the court that jurisdiction exists." *Id.* (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)). "Faced with a motion to dismiss for lack of personal jurisdiction, a district court may choose from among several methods for determining whether the plaintiff has met [its] burden." *Id.* (quoting *Adelson v. Hananel*, 510 F.3d

3

43, 48 (1st Cir. 2007) (internal quotation marks omitted) ((quoting *Daynard v. Ness,*
*Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 50-51 (1st Cir. 2002))). "The
different methods involve application by the district court of different legal
standards." *Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 674-79 (1st Cir. 1992)
(discussing the different methods and standards); *see Foster-Miller, Inc. v. Babcock &*
*Wilcox*, 46 F.3d 138, 145-47 (1st Cir. 1995) (describing the prima facie, preponderance
and likelihood standards).

Here, the Court elects to use "'the prima facie method' or the 'prima facie
evidentiary standard,' rather than adjudicating the jurisdictional facts." *Astro-Med*,
591 F.3d at 8.  Under the prima facie standard, "the inquiry is whether the plaintiff
has proffered evidence which, if credited, is sufficient to support findings of all facts
essential to personal jurisdiction." *Bluetarp Fin., Inc.  v. Matrix Constr. Co.*, 709 F.3d
72, 79 (1st Cir. 2013) (quoting *Phillips v. Prairie Eye Ctr.*, 530 F.3d 22, 26 (1st Cir.
2008)).  The court accepts "[t]he plaintiff's properly documented evidentiary
proffers . . . as true for purposes of making the prima facie showing, and . . .
construe[s] these proffers in a light most favorable to plaintiff's jurisdictional claim."
*Id.*  "To the extent that they are uncontradicted, [the court] add[s] into the mix the
facts put forward by the defendant."  *Id.* (citing *Cossaboon v. Maine Med. Ctr.*, 600
F.3d 25, 31 (1st Cir. 2010)); *Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc.*,
825 F.3d 28, 34 (1st Cir. 2016).  At this stage, the Court "is not acting as a factfinder."
*Boit*, 967 F.2d at 675.  However, the Court does not credit "conclusory allegations or

draw farfetched inferences." *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 203 (1st Cir. 1994).

### B.     The Motion to Dismiss for Lack of Subject Matter Jurisdiction

Once the Court chooses the prima facie method of proceeding with personal jurisdiction, the analytic method is similar for the companion asserted lack of subject matter jurisdiction.  When a defendant moves to dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction, the plaintiff must show that federal jurisdiction exists. *Acosta-Ramírez v. Banco Popular de Puerto Rico*, 712 F.3d 14, 20 (1st Cir. 2013).  Just as with personal jurisdiction, Plaintiff Hunt bears the "burden to prove the existence of subject matter jurisdiction." *Aversa v. United States*, 99 F.3d 1200, 1209-10 (1st Cir. 1996).  "At the pleading stage, [an order of dismissal] is appropriate only when the facts alleged in the complaint, taken as true, do not justify the exercise of subject matter jurisdiction." *Sáchez ex rel. D.R.-S. v. United States*, 671 F.3d 86, 106 (1st Cir. 2012) (quoting *Muñiz-Rivera v. United States*, 326 F.3d 8, 11 (1st Cir. 2003)).  "In assessing whether the plaintiff has put forward an adequate basis for jurisdiction, 'the court must credit the plaintiff's well-pleaded factual allegations (usually taken from the complaint, but sometimes augmented by an explanatory affidavit or other repository of uncontested facts), draw all reasonable inference from them in [the plaintiff's] favor, and dispose of the challenge accordingly.'" *Id.* (quoting *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001)); *see Merlonghi v. United States*, 620 F.3d 50, 54 (1st Cir. 2010); *Aversa*,

99 F.3d at 1210 (The district court may also "consider whatever evidence has been submitted, such as the depositions and exhibits submitted").

Employing the prima facie approach for personal jurisdiction and the standard approach for subject matter jurisdiction, the Court recites the factual background presented by the parties.

## III.   FACTUAL BACKGROUND

### A.   The Parties

Andrew Hunt died on or around June 5, 2019.  *Pl.'s Opp'n*, Attach. 1, *Decl. of Thomas W. Hunt Sr.* ¶ 4 (*Hunt Sr. Decl.*).  Andrew Hunt was unmarried and had no children, and he died without a will.  *Am. Compl.* ¶¶ 5, 16.  His estate is currently going through probate in Suffolk Probate Court in the commonwealth of Massachusetts.  *Hunt Sr. Decl.* ¶ 3.  Andrew Hunt's father, Thomas W. Hunt, Sr., is eighty-seven years old and lives in Bridgton, Maine.  *Id.* ¶¶ 1-4.  Thomas W. Hunt, Sr. was previously married to Elaine Hunt, but they were divorced many years ago.  *Am. Compl.* ¶ 8.  They have two living children—Thomas W. Hunt, Jr. and Jennifer Hunt.  *Id.* ¶ 7.  Jennifer Hunt and Thomas Hunt, Sr. have been estranged for decades.  *Id.* ¶ 17.  Thomas Hunt, Jr. is a defendant in this case.  *Id.* ¶ 2.

The present dispute arises from actions that Defendant Hunt and Elaine Hunt's sister, a Massachusetts attorney named Jane A. Trudeau, allegedly took regarding Andrew Hunt's estate.  According to Plaintiff Hunt, the pair unlawfully procured his consent to (1) appoint Attorney Trudeau as the estate's personal

representative and (2) renounce his share of the estate's proceeds. *Am. Compl.* ¶¶ 75-116. Plaintiff Hunt seeks relief under several different causes of action. *Id.*

Defendant Hunt has lived in Narragansett, Rhode Island since 2015. *Pl.'s Opp'n*, Attach. 11, *Aff. of Thomas W. Hunt, Jr.* ¶ 2 (*Hunt Jr. Aff.*). Before then, he lived in New Hampshire and the Boston, Massachusetts area. *Id.* ¶ 8. Defendant Hunt has never lived in Maine, owns no property here, has never owned property here, and has never owned, operated, or conducted any business in Maine. *Id.* ¶¶ 3-5, 10. He has not entered Maine since 2017, when he traveled to Maine once to help his father move and twice to visit his father in the hospital. *Id.* ¶ 7. Before that, he was in Maine for his father's wife's funeral in 2016, for a sailing competition at Maine Maritime Academy in either 2006 or 2007, and to visit his father and his father's wife "at their place in Maine a few times" before 2001. *Id.* ¶¶ 7-9.

Jane Trudeau is eighty-three years old and lives in Lexington, Massachusetts. *Pl.'s Opp'n*, Attach. 7, *Decl. of Jane A. Trudeau* ¶ 1 (*Trudeau Decl.*). Ms. Trudeau is an attorney who focuses on estate planning and taxation. *Id.* ¶ 2. Her firm, Trudeau & McAvoy LLP, has offices in Lexington and Melrose, Massachusetts. *Id.* She is admitted to practice law in Massachusetts and has never been admitted to practice in Maine. *Id.* ¶¶ 3-4. Her law firm does not practice in Maine either. *Id.* ¶ 5. Neither Attorney Trudeau nor her firm owns property in Maine. *Id.* ¶ 6.

### B. The Alleged Wrongdoing

Plaintiff Hunt claims he was very close with his son Andrew and heavily relied upon him for financial advice and help with life decisions. *Hunt Sr. Decl.* ¶ 6. For

many years before Andrew's death, Plaintiff Hunt did not trust Defendant Hunt or have a close relationship with him. *Id.* ¶ 14. Until about five years ago, the two men had "no relationship and very little, if any, communication." *Pl.'s Opp'n*, Attach. 2, *Decl. of Sharon L. Sexton-Brady* ¶ 9 (*Brady Decl.*); *Hunt Sr. Decl.* ¶ 15. Closer to Andrew's death, the men "did not have a close relationship" and "communicated very infrequently." *Brady Decl.* ¶ 9; *Pl.'s Opp'n*, Attach. 3, *Decl. of Marsha Rigby* ¶ 4 (*Rigby Decl.*). Plaintiff Hunt is estranged from his daughter, Jennifer Hunt. *Brady Decl.* ¶ 4. He specifically disinherited her from his own will many years ago and does not want her to benefit from his estate or Andrew Hunt's estate. *Hunt Sr. Decl.* ¶ 32; *Brady Decl.* ¶ 6; *Rigby Decl.* ¶¶ 6-7.

Plaintiff Hunt indicates that after Andrew Hunt died, Defendant Hunt began calling him frequently, sometimes multiple times per day, while Plaintiff Hunt was at his home in Bridgton, Maine. *Hunt Sr. Decl.* ¶ 18; *Brady Decl.* ¶¶ 10-12; *Rigby Decl.* ¶¶ 9-12. He avers that most of the calls related to Andrew Hunt's estate and that some concerned an estate disclaimer that Attorney Trudeau sent to the elder Hunt. *Hunt Sr. Decl.* ¶¶ 18, 20; *Brady Decl.* ¶¶ 12-13. Plaintiff Hunt states that he did not understand the disclaimer and trusted Defendant Hunt and Attorney Trudeau to look out for his best interests. *Hunt Sr. Decl.* ¶¶ 22-23; *Rigby Decl.* ¶ 15.

Plaintiff Hunt asserts that Defendant Hunt pressured him to sign the disclaimer, notarize it, and return it to Attorney Trudeau.[2] *Id.* ¶¶ 20-21. He alleges

---

[2]      Thomas Hunt, Jr. denies making any of the statements or phone calls pressuring his father to sign the disclaimer or misrepresenting the value of Andrew Hunt's estate. *Hunt Jr. Aff.* ¶¶ 11-13. He acknowledges that he spoke to his father regularly by phone "a couple to several times per month" before his father filed this lawsuit. *Id.* ¶ 14. He states that following Andrew Hunt's death, he called

that Defendant Hunt told him that Andrew Hunt's estate was worth only $5,000.00 and that he needed to sign the disclaimer "so the estate could get going." *Id.* ¶ 27. In fact, Andrew Hunt's estate is worth approximately $841,700.00. *Id.* ¶ 34. Plaintiff Hunt states that neither Attorney Trudeau nor Mr. Hunt, Jr. ever told him the actual value of the estate before he signed the disclaimer. *Id.* ¶ 28. Plaintiff Hunt also avers that although he spoke with Attorney Trudeau several times on the phone after Andrew Hunt's death about the estate, he does not recall that she ever told him to obtain independent counsel. *Hunt Sr. Decl.* ¶¶ 24-25.

Jurisdictional discovery fleshed out specifics. Defendant Hunt states that between June 5, 2019 and February 1, 2020 he communicated with his father only by telephone and at "a few face to face visits." *Pl.'s Opp'n*, Attach. 9, *Def. Thomas Hunt, Jr.'s Objs. and Answers to Pl.'s Interrogs.* at 2 (*Hunt Jr. Interrog. Answers*). A rudimentary call log shows Plaintiff Hunt, Sr. and Defendant Hunt exchanged 117 phone calls between July 15, 2019 and January 7, 2020, but it does not reveal who called whom.[3] *Id.* at 7. Defendant Hunt says that he spoke to his father by phone on June 6, 2019, the day after Andrew Hunt died, "to discuss what happened." *Id.* at 3. The men also "spoke about Andrew's service, and other family decisions about the type of service, the location of the service and having Andrew's remains cremated, as

---

his father "to discuss the things that needed to be done and the decisions that needed to be made with regard to [his] brother's possessions, condominium, and funeral." *Id.* ¶ 15. For purposes of this order, the Court credits Thomas Hunt, Sr.'s version.

[3]    The Court reviewed Attorney Stouder's affidavit which explains the reasons for the questionable quality of this important document. *Hunt Jr. Reply*, Attach. 1, *Aff. of Elizabeth G. Stouder*. Attorney Stouder subpoenaed additional records from Metro PCS on September 16, 2020. *Id.* ¶ 14. Attorney Stouder has not yet supplemented the record before the Court with a more complete call history.

well as other decisions the family had to make." *Id.* at 4. Plaintiff Hunt and Defendant Hunt next saw each other in June at Andrew Hunt's funeral and reception in Rhode Island. *Id.* at 2.

Attorney Trudeau states that she "was asked to serve as the Personal Representative of the estate of Andrew Hunt" on June 21, 2019. *Trudeau Decl.* ¶ 7. She indicates that Andrew Hunt's mother, Elaine Hunt, "informed [her] that she did not want to be a beneficiary of the estate" and that Thomas Hunt, Jr. stated "his father Thomas Hunt, Sr. had reservations about being a beneficiary of Andrew's estate." *Id.* ¶ 9. Also, on June 21, 2019, Attorney Trudeau received Thomas Hunt, Sr.'s mailing address in Bridgton, Maine by email from Thomas Hunt, Jr. *Pl.'s Opp'n*, Attach. 5, *Def.*, *Jane A. Trudeau's Suppl. Answers to Interrogs. Propounded by Pl., Thomas Hunt, Sr.* at 3 (*Trudeau Suppl. Interrog. Answers*).

On July 25, 2019, Carol O'Leary, one of Attorney Trudeau's legal assistants, mailed Thomas Hunt, Sr. a letter and assent form to his Bridgton, Maine address. *Id.* Ms. O'Leary's letter indicated that she was sending the assent form "[a]t the request of Jane Trudeau . . . ." *Pl.'s Opp'n*, Attach. 6, *Jane A. Trudeau's Resps. to Req. for Produc. of Docs. Propounded by Pl., Thomas W. Hunt, Sr.* at 11 (*Trudeau RFP Resp.*). The letter further told Plaintiff Hunt that "[a]s an heir [his] Assent is necessary in order for" a petition requesting Attorney Trudeau be appointed as personal representative of Andrew Hunt's estate "to be allowed." *Id.* The call log that Defendant Hunt produced indicates that he and Plaintiff Hunt exchanged six phone

calls between July 28, 2019 and July 29, 2019.  *Hunt Jr. Interrog. Answers* at 7.
Plaintiff Hunt executed the assent form on July 29, 2019.  *Id.* at 8.

Attorney Trudeau received the executed assent form from Plaintiff Hunt
several days later.  *Trudeau Suppl. Interrog. Answers* at 3.  She attempted to file the
form with the Suffolk County Probate Court in Massachusetts, but the probate court
did not accept it, due to extraneous writings on the document.  *Id.*

On August 19, 2019, Carol O'Leary mailed another letter and assent form to
Thomas Hunt, Sr. in Bridgton, Maine.  *Id.*  That letter informed Plaintiff Hunt that
the probate court refused to accept his initial assent form due to the extraneous
writings and instructed him to "only sign [his] name where indicated."  *Trudeau RFP
Resp.* at 10.  He was further instructed to contact Attorney Trudeau with any
questions or concerns.  *Id.*  Plaintiff Hunt signed the form and dated it August 21,
2019.  *Id.* at 9.  Between August 19, 2019 and August 21, 2019, Plaintiff Hunt and
Defendant Hunt exchanged seventeen phone calls.  *Hunt Jr. Interrog. Answers* at 7.

On or about August 27, 2019, Plaintiff Hunt called Attorney Trudeau at her
law office in Massachusetts.  *Trudeau Suppl. Interrog. Answers* at 4.  She states that
he asked "whether Mr. Hunt, Jr. would receive the estate proceeds outright if Thomas
Hunt, Sr. disclaimed his interest in the estate."  *Id.*  She "explained to Thomas Hunt,
Sr. that Thomas Hunt, Jr. would receive the estate proceeds if he disclaimed his
interest."  *Id.*  Attorney Trudeau further avers that Plaintiff Hunt "did not express
any reservations about the disclaimer itself during that phone call."  *Id.*  She states
that she acquired Thomas Hunt, Sr.'s phone number from this call.  *Id.*

On September 10, 2019, Attorney Trudeau was officially appointed as personal representative of Andrew Hunt's estate. *Id.* at 4; *Trudeau Decl.* at 2. On October 8, 2019, Plaintiff Hunt again called Attorney Trudeau. *Trudeau Suppl. Interrog. Answers* at 4. She indicates that during this call Plaintiff Hunt "confirmed . . . that he wished to disclaim his share of Andrew Hunt's estate so that the estate assets would go to his daughter Jennifer Hunt and son Thomas Hunt Jr." *Id.* She states that she conveyed the substance of this call to Elaine Hunt, Thomas Hunt, Jr. and Jennifer Hunt by email later that day. *Trudeau Decl.* at 2-3. The call log shows Defendant Hunt and Plaintiff Hunt exchanged nineteen phone calls between September 30, 2019 and October 8, 2019. *Hunt Jr. Interrog. Answers* at 7.

On October 23, 2019, Attorney Trudeau sent Plaintiff Hunt a letter and qualified disclaimer form to his home in Bridgton, Maine. *Trudeau Suppl. Interrog. Answers* at 4. The letter reiterated that both Plaintiff Hunt and Elaine Hunt were Andrew Hunt's heirs at law because he died without a will. *Trudeau RFP Resp.* at 5. It further stated that although Plaintiff Hunt and Elaine Hunt are "entitled to 50% of Andrew's probate estate," they have both indicated that they wished to disclaim their shares so that Thomas and Jennifer could "take both shares." *Id.* The letter also explained that she had attached a form that would allow Plaintiff Hunt to disclaim his interest in the estate provided that Elaine Hunt also disclaimed her share. *Id.* A handwritten note at the bottom of the letter reads: "Hi Tom, Give me a call with any questions. Jane." *Id.*

The disclaimer indicated that the estate contained a condominium, bank accounts, non-retirement investment accounts, and other unspecified assets. *Id.* at 6. The disclaimer also acknowledged that it was irrevocable and done for no consideration. *Id.* The disclaimer stated that Plaintiff Hunt "request[s] that **JANE A. TRUDEAU** as Personal Representative of said estate accept and file this disclaimer." *Id.* Plaintiff Hunt signed the enclosed disclaimer, and had it notarized in Maine on October 30, 2019. *Id.* at 6-7. The call log reveals that Defendant Hunt and Plaintiff Hunt had one call on October 25, 2019. *Hunt Jr. Interrog. Answers* at 7. According to the log, this was their only call between October 9, 2019 and November 1, 2019. *Id.*

Plaintiff Hunt visited Rhode Island in November 2019. *Id.* at 3. Defendant Hunt states that his father handed the already-signed disclaimer to him in an envelope at Sharon Sexton-Brady's house. *Id.* Ms. Sexton-Brady is Plaintiff Hunt's niece and Defendant Hunt's cousin, who lives in Pawtucket, Rhode Island. *Brady Decl.* at 2-3. Defendant Hunt sent this disclaimer, along with Elaine Hunt's signed disclaimer, to Attorney Trudeau for filing with the probate court. *Hunt Jr. Interrog. Answers* at 3. Attorney Trudeau states that she received the executed disclaimers at her law office on November 7 or 8, 2019, incorrectly dated her own signature as October 30, 2019, and filed both disclaimers with the probate court on November 18, 2019. *Pl.'s Opp'n*, Attach. 4, *Def., Jane A. Trudeau's Answers to Interrogs. Propounded by Pl., Thomas W. Hunt, Sr.* at 6 (*Trudeau Interrog. Answers*). She has

since "begun the process of liquidating the assets of the estate." *Trudeau Decl.* ¶¶ 21-22.

Apparently, while also in Pawtucket during early November, Defendant Hunt told Plaintiff Hunt that Andrew Hunt's estate was only worth $5,000.00. *Rigby Decl.* ¶ 13; *Brady Decl.* ¶ 14; *Am. Compl.* ¶¶ 50-56. Ms. Sexton-Brady and Marsha Rigby, Plaintiff Hunts sister, overheard this. *Rigby Decl.* ¶ 13; *Brady Decl.* ¶ 14; *Am. Compl.* ¶¶ 50-56. When Ms. Rigby and Ms. Sexton-Brady questioned Defendant Hunt about his statement, he reaffirmed that the estate was only worth $5,000.00. *Brady Decl.* ¶ 14; *Rigby Decl.* ¶ 14; *Am. Compl.* ¶¶ 50-56. In fact, Andrew Hunt's estate is worth approximately $841,700.00. *Am. Compl.* ¶ 34. Ms. Rigby and Ms. Sexton-Brady also say that after he signed the disclaimer, Plaintiff Hunt told them that he did not understand what a disclaimer was and would have never signed it had he known the true value of Andrew Hunt's estate. *Rigby Decl.* ¶¶ 15-16; *Brady Decl.* ¶¶ 15-16; *Am. Compl.* ¶¶ 50-56.

Sometime between November 3, 2019 and November 8, 2019, Attorney Trudeau called Thomas Hunt, Sr. but Marsha Rigby answered the phone. *Rigby Decl.* ¶ 17. Ms. Rigby told Attorney Trudeau that Plaintiff Hunt did not intend to disclaim his inheritance, to which Ms. Trudeau responded, "that's too bad, he signed it" and then hung up. *Id.*

On December 12, 2019 Attorney Trudeau returned a call from a Maine attorney who had called her on behalf of Plaintiff Hunt. *Trudeau Suppl. Interrog. Answers* at 4. They discussed the disclaimer form that Plaintiff Hunt signed. *Id.*

14

The Maine attorney believed that the disclaimer potentially violated Maine law. *Id.* Over the course of the next week, Plaintiff Hunt and Defendant Hunt exchanged forty-two phone calls, including nineteen on December 16, 2019 and twenty-two on December 17. *Hunt Jr. Interrog. Answers* at 7. Plaintiff Hunt states that his father told him that he was in Florida during these calls. *Id.* at 4. They discussed the disclaimer on both days. *Id.*

On January 3, 2020, Attorney Trudeau's law partner, Patrick McAvoy, sent a letter to the Maine attorney who had called Attorney Trudeau in December to discuss the disclaimer. *Trudeau Suppl. Interrog. Answers* at 4. That letter asserts that the disclaimer is valid under Massachusetts and Maine law. *Trudeau RFP Resp.* at 15-16. Defendant Hunt and Plaintiff Hunt had one phone call on January 4, 2020. *Hunt Jr. Interrog. Answers* at 7. Plaintiff Hunt called Attorney Trudeau at her office on January 6, 2020, but she did not speak to him because he was represented by counsel. *Trudeau Suppl. Interrog. Answers* at 4. Defendant Hunt and Plaintiff Hunt spoke again by phone on January 7, 2020, while Plaintiff Hunt was in Florida. *Hunt Jr. Interrog. Answers* at 7. They again discussed the disclaimer. *Id.* at 4.

## IV.   THE PARTIES' POSITIONS

### A.   Jane Trudeau's Motion to Dismiss

Attorney Trudeau moves to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(2) for lack of subject matter jurisdiction and personal jurisdiction. She begins by articulating the familiar law on personal jurisdiction and contends that

Maine's long-arm statute authorizes personal jurisdiction to the full extent of the Fourteenth Amendment's Due Process Clause. *Trudeau Mot.* at 5-7.

Attorney Trudeau first argues that exercising specific personal jurisdiction over her in Maine violates due process. *Id.* The crux of this argument is that she lacks sufficient minimum contacts with Maine. *Id.* at 9-10. To the extent that she has minimum contacts, she argues that those contacts are insufficiently related to Plaintiff Hunt's claims and do not show purposeful availment to make it reasonably foreseeable that she would be subject to personal jurisdiction in Maine. *Id.* at 9-10.

On relatedness, Attorney Trudeau compares her actions to other attorneys in *Sawtelle v. Farrell*, 70 F.3d 1381, 1389-90 (1st Cir. 1995), over whom New Hampshire lacked personal jurisdiction. *See Trudeau Mot.* at 10 (discussing *Sawtelle*, 70 F.3d at 1389-90). She states that the First Circuit "concluded that the cause of the plaintiff's injury was the 'aggregate' of the defendant law firms' alleged negligent acts and omissions, and the 'effective cause' was the extra-territorial negligence, rather than the handful of communications to the client in New Hampshire." *Id.* at 10-11. She notes that the First Circuit described "the defendants' in-forum communications [as] only 'ancillary' to their non-forum activities, and characterized the plaintiff's effort to establish 'relatedness' as 'tenuous as best.'" *Id.* at 11 (citing *Sawtelle*, 70 F.3d at 1391). Attorney Trudeau also cites *Duncan v. O'Shea*, 376 F. Supp. 3d 115 (D. Me. 2019) for a similar proposition. *Id.* She concludes that when activities in Maine are "ancillary to the wrongful acts" alleged to have occurred elsewhere, a party's contacts

with Maine are not sufficiently related to the underlying litigation to properly exercise specific personal jurisdiction. *Id.*

Attorney Trudeau further declares that she has not purposefully availed herself "of any benefits or privileges of conducting activities in the State of Maine." *Id.* at 12. In support, she states that her personal and professional life reveal that she "has no relationship to Maine" thus she "could not purposefully avail herself of the 'benefits and protections afforded by the forum's laws.'" *Id.* at 13 (citing *Salisbury Cove Assocs., Inc. v. Indcon Design (1995) Ltd.*, 211 F. Supp. 2d 184, 191 (D. Me. 2002)). She notes that her "only contact with Maine was to mail Massachusetts probate forms to Plaintiff in connection with probating a Massachusetts estate." *Id.*

Attorney Trudeau next contends that she "could not have reasonably expected that she would be hauled into court in Maine based upon her service as the Personal Representative of a Massachusetts estate that was actively being probated in Massachusetts." *Id.* She observes that this connection "did not 'establish a continuing obligation between [herself] and the forum state.'" *Id.* (quoting *Sawtelle*, 70 F.3d at 1393). She states that her "contacts with Maine did not amount to a 'substantial connection' with the state, and did not reflect 'anticipated ongoing relations after the business transaction was complete.'" *Id.* at 14 (citing *Salisbury Cove*, 211 F. Supp. 2d at 194-95). Thus, she concludes that she "does not subject herself to [Mr. Hunt, Sr.'s] home jurisdiction simply by mailing Massachusetts probate forms to him, wherever he resides." *Id.*

17

Addressing the final prong of the personal jurisdiction analysis, Attorney Trudeau argues that exercising specific personal jurisdiction over her would be unreasonable. *Id.* at 14-15. She says that her "burden and expense of appearing in this court would be great." *Id.* at 15. She argues that "Maine has no interest in this dispute, which deals entirely with a Massachusetts probate matter . . .." *Id.* at 16. She claims "jurisdiction in Maine would not further the Plaintiff's interest in obtaining convenient and effective relief." *Id.* She also avers that "the most effective and efficient way to handle this case [is] to allow Plaintiff's claims to be addressed by the Massachusetts Probate Court . . .." *Id.* Lastly, she claims that exercising jurisdiction over her would undermine the sovereign interests of Massachusetts and Maine. *Id.* at 16-17.

Next, Attorney Trudeau argues that the Court should abstain from deciding this case. *Id.* at 17. Her first argument for abstention is that the so-called probate exception precludes federal jurisdiction. *Id.* (citing *Jiménez v. Rodríguez-Pagán*, 597 F.3d 18, 23 (1st Cir. 2010)). She contends that the "[e]xercise of federal jurisdiction in this case will unquestionably result in interference with property currently in the jurisdiction of Massachusetts." *Id.* at 18.

Attorney Trudeau also contends that abstention is proper under the doctrines of *Younger*[4] and *Colorado River*[5] abstention. *Id.* at 19. She argues that as extended to civil cases through *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1 (1987), *Younger* abstention weighs in favor of abstention when there is an ongoing state court case

---

[4]   *Younger v. Harris*, 401 U.S. 37 (1971).
[5]   *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976).

which affords the plaintiff a meaningful opportunity to assert the claims brought in the federal suit. *Id.* (citing *Brooks v. N.H. Sup. Ct.*, 80 F.3d 633, 638 (1st Cir. 1996)). She also claims that the First Circuit's eight-factor test for *Colorado River* abstention weighs in favor of abstention. *See id.* at 20 (citing *Jiménez*, 597 F.3d at 27-28); *see also id.* at 21-23 (analyzing the *Colorado River* factors).

### B.     Thomas W. Hunt, Jr.'s Motion to Dismiss

Defendant Hunt incorporates Attorney Trudeau's motion to dismiss by reference. *Hunt Mot.* at 1. After stating the personal jurisdiction standard, *id.* at 4-8, Defendant Hunt argues that the reasonableness prong is not met. *Id.* at 8. He contends that "Maine does not have any interest beyond mere citizenry" in this litigation. *Id.* He notes that "[v]irtually all of the witnesses are located in Massachusetts and/or Rhode Island." *Id.* Moreover, he highlights that "[t]he Complaint itself arises from an alleged wrongful interference with an estate that is located in Massachusetts and that is to be distributed in accordance with Massachusetts law." *Id.* Thus, he concludes that Maine's only interest is "to provide redress to its own citizen—an interest that the Maine Law Court has held insufficient . . .." *Id.*

Defendant Hunt next argues that Maine lacks general jurisdiction over him. *Id.* He states that "he has no continuous and systematic linkage to Maine." *Id.* Additionally, Defendant Hunt avers that Maine lacks specific jurisdiction over him. *Id.* at 9. He avers that "there is no case-specific act by Hunt, Jr. alleged in the Complaint by which he purposefully availed himself of the benefits and protections

of Maine's laws." *Id.* Moreover, he observes none of his alleged conduct even occurred within Maine's borders, but rather in Rhode Island or Massachusetts. *Id.* He denies making any improper statements to his father but asserts that even if he "*had* made the alleged statements and/or committed the alleged acts, the statements were made outside of Maine and the acts occurred outside of Maine." *Id.* (emphasis in original). Thus, he concludes that "[e]ven if the alleged statements and/or alleged acts resulted in negative consequences within Maine, that alone does not justify this court's exercise of personal jurisdiction . . .." *Id.*

Finally, Defendant Hunt argues that the exercise of personal jurisdiction over him "would be exceedingly unfair and unjust." *Id.* at 10. He notes again that his contacts with the forum are limited, he is not alleged to have committed a "case-specific act" in Maine, and that Maine has "no interest in this matter beyond mere citizenry." *Id.* Moreover, he highlights that "it would be inordinately expensive and inconvenient" for him to litigate in Maine and "difficult for him to secure the attendance of non-resident witnesses for deposition and trial" and that he has a health condition, which "makes it severely difficult for him to travel back and forth between Maine and his residence in Rhode Island." *Id.* He also cares for his ailing mother and would need to arrange for her care if forced to litigate in Maine. *Id.*

## C.   Thomas Hunt, Sr.'s Consolidated Opposition

Plaintiff Hunt argues that the Court has specific personal jurisdiction over both Defendant Hunt and Attorney Trudeau. *Pl.'s Opp'n* at 7. He contends that the absence of physical presence within Maine does not preclude personal jurisdiction

because both defendants "nevertheless exerted their presence in this State through numerous and strategic contacts." *Id.* at 9.  He further avers that Defendant Hunt's and Attorney Trudeau's contacts with Maine "are material elements of the claims now pending in this Court." *Id.*

Plaintiff Hunt first considers whether the defendants' contacts with Maine are related to his causes of action.  Regarding Attorney Trudeau, Plaintiff Hunt contends that her "repeated and purposeful contacts with Thomas [Hunt, Sr.] in Maine through written correspondence and by phone are directly related and integral to the claims alleged against her."  *Id.*  He cites *Slade Gorton & Company v. HSBC Bank Canada*, No. 13-cv-12290-DJC, 2014 U.S. Dist. LEXIS 133613, at *21-22 (D. Mass. Sept. 23, 2014) for the premise that allegedly fraudulent communications directed to a party within the forum state satisfy the relatedness prong of the personal jurisdiction test when the underlying cause of action is one for fraud.  *Id.* at 9-10.  He also distinguishes his own case from *Sawtelle*, 70 F.3d at 1381, by arguing that in *Sawtelle* the malpractice cause of action accrued in Florida, but his cause of action under Maine's improvident transfer statute accrued in Maine.  *Id.* at 13.  He thus concludes that Attorney Trudeau's alleged contacts with Maine "are not ancillary to the wrongful acts – they are the wrongful acts." *Id.* at 14.

Plaintiff Hunt, Sr. makes a similar relatedness argument about Defendant Hunt's contacts with Maine.  *Id.*  He describes Defendant Hunt's calls to his father in Maine as "central to, and inextricable from, his tortious conduct in Maine."  *Id.* at 15. He further states that the phone calls "are elements of the causes of action" and are

also "the very contacts that set this entire civil action into motion." *Id*. Moreover, he observes that Defendant Hunt obtained a "substantial benefit" from his contacts with Maine, to the tune of an approximately $420,000.00 share of Andrew Hunt's estate. *Id*. at 16.

Plaintiff Hunt then shifts to whether the defendants purposely availed themselves of Maine's jurisdiction through their contacts with the forum. *Id*. He contends that purposeful availment "can be established by a single act." *Id*. (citing *Adams v. Adams*, 601 F.3d 1, 6 (1st Cir. 2010); *Noonan v. Winston Co.*, 135 F.3d 85, 90-91 (1st Cir. 1998)). He claims that Attorney Trudeau's "only contact in the forum state was with [Plaintiff Hunt] and was made for the express purpose of executing the documents that gave rise to this action . . .." *Id*. at 17. He states that these acts "were voluntary in every meaningful sense . . .." *Id*. He also notes that Defendant Hunt's contacts with Maine were purposeful because "he initiated most, if not all, of these contacts on his accord and for his own benefit." *Id*. at 18.

Plaintiff Hunt further contends that the defendants' contacts with Maine made the exercise of personal jurisdiction foreseeable. *Id*. at 18-19. He intimates that Attorney Trudeau should have known that transmitting false information with the intent to induce Plaintiff Hunt to disclaim his share of the estate would subject her to personal jurisdiction in Maine. *Id*. at 19. Plaintiff Hunt claims that Attorney Trudeau extracted a benefit from her contacts with him and the state of Maine because those contacts led her to become the estate's personal representative. *Id*. at 20. Therefore, he concludes that Attorney Trudeau's contacts with Maine do not

arise from passive activity but rather from her "quarterback[ing] the entire endeavor, playing an active, leading, and integral role in obtaining the role of personal representative . . .." *Id.* at 21-22.

Regarding Defendant Hunt, Plaintiff Hunt contends that personal jurisdiction over him was a foreseeable consequence of his "contacts with his father in Maine with the intention of obtaining a benefit from him: a large inheritance." *Id.* at 23. He points out the number of phone calls between himself and his son, which spike immediately after Attorney Trudeau twice sent probate forms. *Id.* He also discusses how all actions were undertaken to secure the disclaimer and a personal benefit. *Id.* at 24.

Finally, Plaintiff Hunt argues that the exercise of personal jurisdiction over both defendants is reasonable. *Id.* He avers that the burden on them to appear in Maine is slight, that Maine has a strong interest in adjudicating this dispute, that he has an inherent interest in obtaining relief in Maine, and that it is efficient and in the common interest of Maine and Massachusetts. *Id.* at 24-29.

Plaintiff Hunt also requests that the Court assert personal jurisdiction over Attorney Trudeau on the theory that Defendant Hunt was her agent and therefore his acts must be imputed to her for purposes of the jurisdictional analysis. *Id.* at 29-31.

Shifting to the abstention issue, Plaintiff Hunt contends that the court should not abstain. *Id.* at 31. He first argues that the probate exception is "narrowly limited to only those cases requiring a federal court to either probate a will, annul a will,

administer a decedent's estate, or dispose of property in the custody of a state probate court." *Id.* at 32.  He contends that the only relevant issue is whether this case falls within the fourth category listed above.  *Id.*  He says it does not, reasoning the fourth category only applies to cases of in rem jurisdiction and that his action is in personam. *Id.* at 32-33.

Regarding *Younger*, Plaintiff Hunt argues that *Younger*'s civil component is "completely inapplicable to this case."  *Id.* at 34.  He states that unlike *Younger* and its progeny, this case implicates neither a criminal case, nor a civil equivalent to a criminal case, nor a "process by which states enforce court orders."  *Id.* at 34-35.  Thus, he concludes there is no basis to abstain.  *Id.* at 35.  His conclusion on *Colorado River* abstention is similar.  *Id.* at 38.  He runs through the well-established eight-factor test and concludes that the balance weighs in favor of exercising jurisdiction.  *Id.* at 35-38.

### D.   Jane Trudeau's Reply

In her reply, Attorney Trudeau responds to Plaintiff Hunt's argument that Maine has specific personal jurisdiction over her.  *Trudeau Reply* at 1-2.  She points out that Plaintiff Hunt has provided no evidence that she ever made any misrepresentation to him.  *Id.* at 2.  Rather, he has only alleged the misrepresentations arose from the actions of Defendant Hunt.  *Id.*  She notes that Plaintiff Hunt's Complaint makes no allegation against her for fraud, because "fraud *must* be plead with particularity, and there are no facts to support any allegation of fraud against Defendant Trudeau."  *Id.* (emphasis in original).  She continues, stating

24

that, because Plaintiff Hunt has proffered no evidence of fraud, his action against her is not related to her specific contacts with Maine. *Id.* She concludes her "three form letters and two phone calls initiated by [Plaintiff] Hunt" are not enough for Maine to assert jurisdiction over her. *Id.* at 3.

### E.  Thomas W. Hunt, Jr.'s Reply

Thomas Hunt, Jr.'s reply first addresses contentions by Plaintiff Hunt that he has failed to produce an adequate record of his telephone records to comply with discovery requests. *Hunt Jr. Reply* at 1. Defendant Hunt explains that to the extent the records are incomplete, he has made substantial efforts to comply with the discovery requests but is constrained by his mobile phone service provider. *Id.* He believes that he provided accurate information. *Id.* He notes that his counsel attempted to obtain records from his phone service provider, but that his pre-paid service provider only keeps records for three months and therefore records from the relevant time period are unavailable. *Id.* His counsel also notes that she attempted to obtain the records directly from his service provider, again without success. *Id.* at 1-2; *Id.*, Attach. 1, *Aff. of Elizabeth G. Stouder.*

Next, Defendant Hunt argues that, even assuming his out-of-state conduct caused harm in Maine, the Court cannot assert personal jurisdiction over him. *Id.* at 2. He cites decisions from the Maine Law Court for the proposition that jurisdiction does not arise from causing consequences inside a state when the tortfeasor's alleged conduct occurred outside Maine. *Id.* (citing *Martin v. Deschenes*, 468 A.2d 618, 619 (Me. 1983); *Frazier v. BankAmerica Int'l*, 593 A.2d 661, 663 (Me.

25

1991); *Murphy v. Keenan*, 667 A.2d 591, 595 (Me. 1995)).  Here, he contends that the jurisdictional discovery has revealed the allegations that he pressured Plaintiff Hunt to sign the disclaimer and misrepresented the estate's value allegedly occurred while Defendant Hunt was in Rhode Island, not Maine.  *Id.* at 2-3.

Defendant Hunt also argues that Plaintiff Hunt has not shown purposeful availment.  *Id.* at 3.  He avers that there are no facts showing that he established the necessary "substantial connection" with Maine.  *Id.* at 4.  According to Defendant Hunt, an essential ingredient of the "substantial connection" inquiry is whether he has "purposefully availed himself of the benefits and protections of Maine's laws."  *Id.*  He claims he did not, because "he did not create any continuing obligations between himself and the residents of the forum."  *Id.* at 4-5.  Thus, he concludes that the existence of an injury in Maine does not, standing alone, provide for jurisdiction over him.  *Id.* at 5.

Defendant Hunt also argues that the probate exception applies.  *Id.*  He claims that because Plaintiff Hunt seeks a constructive trust over Andrew Hunt's estate, which is jurisdiction over a res, it does not matter that the claims are technically in personam.  *Id.* at 5-6.  Rather, because the remedy Plaintiff Hunt pursues would "amount to a disposition of property that is in the custody of the Massachusetts probate court" the exception applies.  *Id.* at 6.  Moreover, he contends that similar considerations weigh in favor of *Colorado River* abstention.  *Id.* at 6-7.

## V.    DISCUSSION

The Defendants' motions present two primary questions about judicial power. The first addresses personal jurisdiction: whether the Court has the power over the parties to enforce a final judgment. The second concerns subject matter jurisdiction: whether the Court is vested with the power to decide this kind of case. A third subsidiary question is whether, assuming the Court has personal and subject matter jurisdiction, it should abstain from exercising it out of respect for our nation's system of judicial federalism.

### A.    Personal Jurisdiction

#### 1.    Legal Standard

When sitting in diversity jurisdiction, a federal court "is the functional equivalent of a state court sitting in the forum state." *Baskin-Robbins*, 825 F.3d at 34 (internal citation omitted). "Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). As such, the district court has personal jurisdiction over a party when the exercise of jurisdiction is consistent with the forum state's long-arm statute and the Due Process Clause of the Fourteenth Amendment. *Baskin-Robbins*, 825 F.3d at 34. Maine's long-arm statute is coextensive with the "fullest extent permitted by" the Due Process Clause, 14 M.R.S. § 704-A(1), and therefore, the minimum contacts doctrine of the Due Process analysis controls. *Duncan*, 376 F. Supp. 3d at 121.

There are two types of personal jurisdiction. General, or "all-purpose," jurisdiction "broadly subjects the defendant to suit in the forum state's courts 'in

respect to all matters, even those that are unrelated to the defendant's contacts with the forum.'" *Cossaboon*, 600 F.3d at 31 (citing *Phillips Exeter Acad. v. Howard Phillips Fund, Inc.*, 196 F.3d 284, 288 (1st Cir. 1999). General jurisdiction is only proper in a forum state where the defendant is "fairly regarded as at home." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile . . .." *Id.*

Specific jurisdiction is the other variety of personal jurisdiction. It is transaction-specific. *See United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 618 (1st Cir. 2001) ("Specific jurisdiction exists when there is a demonstrable nexus between a plaintiff's claims and a defendant's forum-based activities") (citing *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 34 (1st Cir. 1998)). For specific jurisdiction to attach, "[d]ue process requires that the defendant 'have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Plixer Int'l, Inc. v. Scrutinizer GmbH*, 905 F.3d 1, 7 (1st Cir. 2018) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

Courts use a three-part test to determine whether there are sufficient minimum contacts to satisfy due process. *Duncan*, 376 F. Supp. 3d at 121-22 (citing *Baskin-Robbins*, 825 F.3d at 35). First, the asserted claims must be related to the defendant's contacts with the forum state. *Id.* at 121-22. Second, those contacts must constitute "purposeful availment of the privilege of conducting activities in the forum

state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable." *Baskin-Robbins*, 825 F.3d at 35 (internal quotation marks omitted).  Third, exercising personal jurisdiction must be reasonable.  *Id.*

### a.   Relatedness

"Relatedness requires that 'the action . . . directly arise out of the specific contacts between the defendant and the forum state." *Id.* (citing *Sawtelle*, 70 F.3d at 1389).  The Court must begin this analysis "by identifying the alleged contacts, since there can be no requisite nexus between the contacts and the cause of action if no contacts exist." *Swiss Am. Bank¸* 274 F.3d at 621.

The relevant contacts are those "that the 'defendant *himself*' creat[ed] with the forum state." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985)) (emphasis in original).  "[M]ere injury to a forum resident is not a sufficient connection to the forum." *Id.* at 290 (finding that the plaintiffs' lack of access to money unlawfully seized outside the forum state is an insufficient connection to the forum state because the plaintiff would also lack those funds in all other states).  Instead, courts look "to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Id.* at 285.  A defendant's contacts with persons in the forum state are only relevant to show the extent of the defendant's connection to the forum state itself. *Id.* at 285-86; *see also Burger King* at 479-80 (finding the terms of a contract and business relationship with a party in the forum was sufficient to evince the defendant intended

to have a continuing connection to the forum state); *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 780-81 (1984) (finding selling magazines in the forum state sufficient to establish minimum contacts in a libel suit).

According to the First Circuit, "[t]he relatedness requirement is not an open door; it is closely read, and it requires a showing of a material connection." *Harlow v. Children's Hosp.*, 432 F.3d 50, 61 (1st Cir. 2005). The inquiry is whether the alleged contacts with the forum were the proximate cause of the alleged harm, such that "the defendant's in-state conduct . . . form[s] an 'important, or [at least] material, element of proof' in the plaintiff's case." *Id.* at 61 (quoting *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1088-89 (1st Cir. 1992)). "A broad 'but-for' argument is generally insufficient." *Id.*

Courts apply slightly different relatedness standards depending on whether the plaintiff's claims arise in tort or contract. *See Exeter*, 196 F.3d 290-91 (explaining the difference). For contract claims, contacts are related when they are "essential to either the formation or breach of the alleged contract . . . ." *Swiss Am. Bank*, 274 F.3d at 622; *see Exeter*, 196 F.3d at 291 (finding the place of breach due deference in the relatedness analysis). For torts, "[t]he relatedness inquiry focuses on whether the defendant's in-forum conduct caused the injury or gave rise to the cause of action." *Swiss Am. Bank*, 274 F.3d at 622.

Sending mail or making telephone calls to a person in a forum state is a jurisdictional contact. *Id.* However, these contacts do not meet the relatedness prong when they are "isolated," that is, when the bulk of a defendant's alleged wrongful

conduct occurred outside of the forum state.  *See Exeter*, 196 F.3d at 291 (finding no relatedness because "breach of fiduciary duty occurs where the fiduciary acts disloyally"); *Sawtelle*, 70 F.3d at 1390-91 (finding no relatedness in a legal malpractice action because "it was the aggregate of the defendants' allegedly negligent acts and omissions which caused the . . . injury, and the out-of-forum negligence was the effective cause"); *Kowalski v. Doherty, Wallace, Pillsbury, & Murphy*, 787 F.2d 7, 11 (1st Cir. 1986) (finding no relatedness to New Hampshire where the alleged injury arising from legal malpractice was the plaintiff's loss of the right to recover under a wrongful death claim in Massachusetts); *Duncan*, 376 F. Supp. 3d at 123 (finding no relatedness where the defendant law firm's only contact with Maine was mailing a transfer deed to Maine which was "ancillary" to fraud perpetrated elsewhere).  Thus, "indirect effect[s] of out-of-state injury caused by out-of-state conduct is insufficient to fulfill the relatedness prong."  *A Corp. v. All Am. Plumbing, Inc.*, 812 F.3d 54, 60 (1st Cir. 2016).

### b.    Purposeful Availment

"The purposeful availment inquiry . . . focuses on . . . intentionality."  *Swiss Am. Bank*, 274 F.3d at 623.  The question is "whether a defendant has 'deliberately target[ed] its behavior toward the society or economy of a particular forum [such that] the forum should have the power to subject the defendant to judgment regarding that behavior.'"  *Baskin-Robbins*, 825 F.3d at 36 (quoting *Carreras v. PMG Collins, LLC*, 660 F.3d 549, 555 (1st Cir. 2011) (alteration in original)).

Purposeful availment requires a court to consider voluntariness and foreseeability. *Id.* "Voluntariness requires that 'the defendant's contacts with the forum state proximately result from actions by the defendant himself.'" *Id.* (quoting *Phillips*, 530 F.3d at 28) (emphasis in original). Knowing that the plaintiff is a resident of the forum jurisdiction satisfies the voluntariness requirement. *See Phillips*, 530 F.3d at 28. (finding voluntary contacts when the defendant knew the plaintiff lived in Massachusetts and sent him an employment contract to sign).

Foreseeability asks whether the defendant would "reasonably anticipate being haled into court . . ." in the forum state due to the nature of their contacts. *Id.* The Court uses a totality of the circumstances approach to review voluntariness and considers all of the defendants' contacts with the forum. *Sawtelle*, 70 F.3d at 1391. Being aware of a plaintiff's state citizenship is insufficient to make personal jurisdiction foreseeable. *Phillips*, 530 F.3d at 28-29. Rather, the "test investigates whether the defendant benefitted from [voluntary contacts] in a way that made jurisdiction foreseeable." *Exeter*, 196 F.3d at 292. Jurisdiction is foreseeable when there is a quid pro quo, that is, when nonresidents avail themselves of a state's protections or services. *Phillips*, 530 F.3d at 29. Separately, a high volume of contacts with a party in a jurisdiction can also make personal jurisdiction reasonably foreseeable. *See Baskin-Robbins*, 825 F.3d at 39-40 (discussing how a high volume of communication directed at a party in the forum state constitutes targeting such that the defendant "should have foreseen that, if a controversy developed, it might be haled into . . . court").

32

Regarding attorneys, the First Circuit has said, in no uncertain terms, "[t]he mere existence of an attorney-client relationship, unaccompanied by other sufficient contacts with the forum, does not confer personal jurisdiction over the non-resident in the forum state; more is required." *Sawtelle*, 70 F.3d at 1392.  Thus, in *Sawtelle*, the First Circuit found no purposeful availment when Florida attorneys communicated by phone and mail with clients in New Hampshire.  *Id.*

### c.    Reasonableness

Even where a plaintiff has shown that a defendant has purposeful contacts with the forum state and that those contacts are related to the underlying claims, the plaintiff must also show that exercising personal jurisdiction is reasonable.  *Harlow*, 432 F.3d at 66-67.  Sometimes, unreasonableness will "trump a minimally sufficient showing of relatedness and purposefulness."  *Id.* at 67 (quoting *Ticketmaster*, 26 F.3d at 210).  The Court considers the following factors to determine whether exercising personal jurisdiction is reasonable:

> (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interest of all sovereigns in promoting social policies.

*Id.* (quoting *Pleasant Street*, 960 F.2d at 1088).  Reasonableness is a sliding scale.  *Id.* When the first two prongs do not provide for jurisdiction, the defendant need not offer much evidence that jurisdiction would be unreasonable.  *Id.*  The reverse is also true. *Id.*

### 2.      The Merits[6]

#### a.      Jane A. Trudeau

The Court concludes that that it lacks personal jurisdiction over Attorney Trudeau.  The Court first considers whether there is a nexus between Plaintiff Hunt's claims and Attorney Trudeau's contacts with Maine.  The relevant claims are drawn from the Amended Complaint.  *Am. Compl.*  Counts I and II state claims against Attorney Trudeau under Maine's Improvident Transfer of Title Act, 33 M.R.S. §§ 1021 et seq.  *Am. Compl.* ¶¶ 75-89.  Counts III and IV assert claims for wrongful interference with an expectancy and undue influence.  *Id.* ¶¶ 90-97.  Count VIII asserts Attorney Trudeau breached her fiduciary duties to Plaintiff Hunt by failing to be truthful in her communications with him.  *Id.* ¶¶ 113-16.  Counts V, VI, and VII do not concern Attorney Trudeau.  *Id.* ¶¶ 98-112.

Although the Maine Improvident Transfer of Title Act is a statutory cause of action, the Court views its elements as more closely aligned to tort, not contract law. The Improvident Transfer of Title Act creates a presumption of undue influence under certain circumstances.   33 M.R.S. §§ 1021 et seq.  The Law Court has categorized undue influence as "tortious conduct."  *See Morrill v. Morrill*, 1998 ME 133, ¶ 7, 712 A.2d 1039, 1041-42 (adopting the RESTATEMENT (SECOND) OF TORTS

---

[6]      The Court's analysis focuses only on specific jurisdiction.  Attorney Trudeau is domiciled in Massachusetts.  *Trudeau Decl.* ¶ 1.  Defendant Hunt is domiciled in Rhode Island.  *Hunt Jr. Aff.* Moreover, the sum of their alleged contacts with Maine do not establish that either Defendant is effectively "at home" in Maine.  Therefore, the Court does not have general jurisdiction over either Defendant.

approach that a claim of "tortious interference with an expected legacy" requires a showing of "tortious conduct, such as . . . undue influence").

Moreover, there is a similarity between requirements of the statute and the tort of fraud, particularly involving the sale of land. *See Letellier v. Small*, 400 A.2d 371, 376 (Me. 1979). Indeed, although the Improvident Transfer of Title Act makes it easier to prove the existence of a fiduciary relationship and creates a presumption of undue influence when certain conditions are met, Maine law has recognized that the presence of a fiduciary or special relationship may support the fraud allegation. *Arbour v. Hazleton*, 534 A.2d 1303, 1306 (Me. 1987); *Crowley v. Dubuc*, 430 A.2d 549, 552 (Me. 1981). A similar analysis is applicable to the claims for wrongful interference with an expectancy, undue influence, and breach of alleged fiduciary duties. The Court concludes that Plaintiff Hunt's claims against Attorney Trudeau sound in tort, although the Court reaches the same conclusion about the absence of personal jurisdiction if the claims are deemed contractual in nature.

Turning to Attorney Trudeau's contacts with Maine, she owns no property in Maine, has never lived here, does not practice law here, and has not been physically present in Maine for years. *Trudeau Decl.* ¶¶ 1-6. On the record, all of her alleged wrongful conduct occurred while she was physically present in the Commonwealth of Massachusetts.

Plaintiff Hunt has identified several contacts between himself and Attorney Trudeau and contends they are related to his claims. On July 25, 2019 her personal assistant, Carol O'Leary, mailed a personal representative appointment assent form

35

to Plaintiff Hunt at his address in Bridgton. *Trudeau Interrog. Answers* at 3. After he completed this form incorrectly, Attorney Trudeau instructed Ms. O'Leary to mail him another form with additional instructions on August 19, 2019. *Id.* On August 27, 2019, she received a call from Plaintiff Hunt asking who would receive his share of the estate if he disclaimed his interest. *Id.* at 4. Attorney Trudeau spoke with Plaintiff Hunt by telephone on October 8, 2019 after he called her. *Id.* On October 23, 2019 she mailed him a letter and the estate disclaimer form. *Id.* She also allegedly called Plaintiff Hunt while he was in Rhode Island at Sharon Sexton-Brady's home in early November 2019. *Rigby Decl.* ¶ 17. However, Marsha Rigby answered the phone and Attorney Trudeau hung up before speaking to Plaintiff Hunt. *Id.*

These contacts with Maine are not sufficiently related to the underlying causes of action. Plaintiff Hunt's claims against Attorney Trudeau assert that she impaired his rights to a portion of his son's estate in Massachusetts by sending him the renunciation and disclaimer forms and by communicating with him via telephone. This satisfies a but-for causation standard of relatedness because he could not have disclaimed his interest without these forms, but that is not the correct test. *Harlow*, 432 F.3d at 62. If Plaintiff Hunt's rights are harmed, his injury will proximately result from Attorney Trudeau preparing both forms in Massachusetts, filing the forms with the probate court there, and making representations before that court. Massachusetts, not Maine, is where Attorney Trudeau is performing her duties as the estate's personal representative. To the extent that Plaintiff Hunt alleges torts,

36

such as breach of fiduciary duties, undue influence, or wrongful interference with an expectancy, *Exeter* provides that this harm occurred in Massachusetts. *See* 196 F.3d at 291 (concluding "breach of fiduciary duty occurs where the fiduciary acts disloyally").

In *Exeter*, the First Circuit expanded on its reasoning. The plaintiff claimed that a Florida decedent, who had executed his will in Florida and directed that upon his death, the stock in his Florida-based real estate development company be turned over to a fund located in Florida, which would in turn share its profits with Phillips Exeter Academy in New Hampshire, the plaintiff. *Id.* at 286-87. The *Exeter* Court set out a "tripartite analysis." *Id.* at 288. First the inquiring court must ask "whether the claim that undergirds the litigation directly relates to or arises out of the defendant's contacts with the forum." *Id.* Second, the court must ask "whether those contacts constitute purposeful availment of the benefits and protections of the forum's laws." *Id.* Third, if the first two criteria are met, the court "must analyze the overall reasonableness of an exercise of jurisdiction in light of a variant of pertinent factors that touch upon the fundamental fairness of an exercise of jurisdiction." *Id.* In upholding the district court's declination of jurisdiction, the First Circuit observed that "[a] breach of fiduciary duty occurs where the fiduciary acts disloyally." *Id.* at 291. The First Circuit wrote that Exeter's receipt of payment in New Hampshire "could not conceivably have *caused* the breach of the duty of loyalty of which Exeter complains." *Id.* (emphasis in original). Emphasizing that a breach of contract occurs

"where a promisor fails to perform," the *Exeter* Court arrived at the same conclusion under a contract theory. *Id.*

Applying this analysis to Plaintiff Hunt's claim, whether in tort or contract, the Court arrives at the same result as the First Circuit in *Exeter*. Attorney Trudeau's actions of alleged disloyalty all took place in the Commonwealth of Massachusetts, where she prepared and filed documents with the Probate Court and where she wrote the letters to Plaintiff Hunt. As in *Exeter*, whether in tort or contract, her minimal telephone and mail contacts with Plaintiff Hunt do not provide a sufficient basis for the assumption of personal jurisdiction.

Moreover, to the extent the claims arise in contract for variations of undue influence, the Court cannot conclude that mailing the forms constituted relevant conduct. The essential conduct for those causes of action is some form of pressure or misrepresentation made to the transferee. The Amended Complaint alleges that when Attorney Trudeau wrote Plaintiff Hunt to the effect that she understood he wished to disclaim his interest in Andrew Hunt's Estate and enclosing forms to do so, Attorney Trudeau breached her fiduciary duties to Plaintiff Trudeau. But, even assuming Attorney Trudeau was mistaken, the allegation does not constitute evidence of pressure or misrepresentation to Plaintiff Hunt, because it merely stating what Attorney Trudeau believed about Plaintiff Hunt's own intentions and Plaintiff Hunt is the one who knew his own mind. The record contains no other such factual allegations against Attorney Trudeau; only three mailings and two phone calls that Plaintiff Hunt himself initiated. Thus, as in *Duncan*, *Exeter*, *Sawtelle* and *Kowalski*,

Attorney Trudeau's actions with respect to Maine are ancillary to any injury that occurred, or in this case may occur, in another jurisdiction.

To the extent Plaintiff Hunt argues that adverse consequences of Attorney Trudeau's mailings in Maine constitutes relatedness, the Court disagrees. His alleged injury is similar to that suffered by the plaintiffs in *Walden*. As the result of the alleged intentional torts, he will lack access to funds he believes he is entitled to. *See Walden*, 571 U.S. at 290 (distinguishing, for relatedness purposes, the peculiarized financial harm caused by a typical intentional tort, which only impacts the victim, from the more widespread harm caused by libel, which disseminates false information to numerous individuals within a forum state in addition to harming the victim's reputation). Therefore, because Attorney Trudeau's contacts with Maine are not sufficiently related to Plaintiff Hunt's claims, the Court lacks specific jurisdiction over her and need not analyze the personal jurisdiction issue further. *See Duncan*, 376 F. Supp. 3d at 123 (citing *Swiss Am. Bank*, 274 F.3d at 625). The Court will continue for the sake of completeness.

The Court also concludes that Attorney Trudeau's conduct does not show she purposefully availed herself of the benefits and privileges of Maine. On three occasions, she sent mail to Thomas Hunt, Sr. in Bridgton, Maine, seeking his signature on legal documents. Although these contacts with a known Maine resident were voluntary, they did not make personal jurisdiction over Attorney Trudeau foreseeable. The Court identifies no benefit that she might have received or any legal privilege that she availed herself of as a result of these voluntary contacts. Moreover,

the contacts themselves were de minimis.  Her phone contacts with Plaintiff Hunt are likewise insignificant—on two occasions he called her, and on the one she called him, she did not speak to him.

On balance, the Court concludes that these contacts are substantially similar to those by the attorneys in *Sawtelle*.  However, Attorney Trudeau's contacts evince an even more minimal connection to the forum state.  While the *Sawtelle* attorneys had an attorney-client relationship with the plaintiffs in New Hampshire, Attorney Trudeau was not Plaintiff Hunt's lawyer.  Although she knew Plaintiff Hunt lived in Maine, her mailings to him were not part of any concerted effort to target the forum, but instead occurred during the performance of her duties as personal representative of Andrew Hunt's Massachusetts estate.  Relatedly, the nature of these contacts weighs further against purposeful availment.  All contacts concerned Mr. Hunt Sr.'s decision to extinguish rights in property located outside of Maine.  In the same vein, the disclaimer abrogated any relationship Attorney Trudeau might have had with Plaintiff Hunt as a potential beneficiary of an estate she was probating.  Therefore, these contacts do not demonstrate any intent by Attorney Trudeau to establish a continuing relationship with Maine or Plaintiff Hunt.  Thus, he has not met his prima facie burden.

The Court also concludes that exercising personal jurisdiction over Attorney Trudeau would be unreasonable.  First, the burden on Attorney Trudeau of litigating in Maine, though not insurmountable, is less convenient than litigating in Massachusetts, where she resides and practices law.  Second, although Maine has an

interest in resolving this dispute, Massachusetts has a greater interest because there are pending parallel proceedings and the case concerns rights to a Massachusetts estate and alleged wrongful conduct by that estate's personal representative. Third, Plaintiff Hunt's interest in convenient and effective relief does not tip the balance toward jurisdiction; there is a parallel forum where he has raised his claims. Fourth, the existence of parallel proceedings with parties not joined to this action makes the judicial system's interest tilt toward declining jurisdiction. A fifth factor is mixed. On the one hand, Maine has an interest in ensuring its Improvident Transfer of Title Act adequately protects its seniors. On the other hand, Massachusetts has an interest in ensuring that Massachusetts estates are properly distributed according to Massachusetts law.

Taking these five factors together and considering relatedness and purposeful availment, the Court concludes that exercising personal jurisdiction over Attorney Trudeau would be inconsistent with "traditional notions of fair play and substantial justice." On balance, Plaintiff Hunt has not met his prima facie burden.

Finally, the Court rejects Plaintiff Hunt's argument that personal jurisdiction over Attorney Trudeau can properly rest on a finding that Defendant Hunt was her agent. Applying bedrock principles of agency law, he was not. *See* RESTATEMENT (THIRD) OF AGENCY §§ 3.01, 3.03 (describing the requirements for forming the principal-agent relationship). Plaintiff Hunt has proffered no evidence that Defendant Hunt ever assented to act as Attorney Trudeau's agent and although it has been said that she "quarterbacked the entire endeavor," Plaintiff Hunt never

alleges that Attorney Trudeau ever gave instructions to Defendant Hunt.  *Pl.'s Opp'n* at 21.

Along a similar line, the Court also rejects Plaintiff Hunt's contention that Attorney Trudeau was acting as Defendant Hunt's agent for purposes of extracting a disclaimer from Plaintiff Hunt in his favor.  The sole allegation in the Amended Complaint supporting this theory is paragraph twenty-five:

> 25.  Upon information and belief, within six weeks of Andrew's death, Mr. Hunt, Jr. and his mother Elaine spoke with Defendant Jane A. Trudeau. Esq., Elaine's sister-in-law and also a Massachusetts attorney, about his brother's estate, and asked Elaine to assist him in (1) probating the Estate, and (2) becoming a beneficiary of the Estate.

*Am. Compl.* ¶ 25.  This allegation, supported only "upon information and belief," may be read as asserting that Defendant Hunt and his mother presented Attorney Trudeau with the assertion that Plaintiff Hunt had decided to disclaim his share in Andrew Hunt's estate in favor of his son Thomas Hunt, Jr. and that they asked her for legal assistance in effecting the desires of the potential beneficiaries of the Estate. This interpretation poses no legal basis for a claim that Attorney Trudeau entered into some form of conspiracy with Elaine Hunt and Thomas Hunt, Jr. to deprive Plaintiff Hunt of his share in the Estate.  A second interpretation could be that Plaintiff Hunt is alleging that the three, Attorney Trudeau, Elaine Hunt, and Thomas Hunt, Jr., agreed to act together to extract a disclaimer from Plaintiff Hunt.  Without more, the Court does not accept this interpretation of the allegation against Attorney Trudeau because it is otherwise unsupported.  *Ticketmaster,* 26 F.3d at 203 (the Court does not credit "conclusory allegations or draw farfetched inferences").

The Court grants Attorney Trudeau's motion to dismiss for lack of personal jurisdiction.

### b.    Thomas W. Hunt, Jr.

The Court concludes that it has personal jurisdiction over Thomas W. Hunt, Jr.  Differences in his alleged conduct distinguish him from Attorney Trudeau.  In contrast to her, his contacts with Plaintiff Hunt in Maine are more voluminous and materially connected to the causes of action against him.

First, the Court must determine Defendant Hunt's relevant contacts with Maine.  Like Attorney Trudeau, Defendant Hunt does not live here, does not work here, and has not visited Maine for years.  *Hunt Jr. Aff.* ¶¶ 2-10.  Most of his contacts with the Maine consist of phone calls between him and his father in the days surrounding his father's decisions to disclaim his status as personal representative and his share of the estate.[7]

Specifically, Plaintiff Hunt asks the Court to consider the six phone calls between Defendant Hunt and Plaintiff Hunt while Plaintiff Hunt was in Maine during the three days before he signed the form renouncing his status as personal representative.  *Pl.'s Opp'n* at 5.  There were an additional seventeen to twenty phone calls between the two men between August 19th to 21st, just before the elder Hunt signed another renunciation form from Attorney Trudeau.  *Id.*  There were seven more calls between Plaintiff Hunt and Defendant Hunt on October 8, 2019, the day

---

[7]     Although the Court cites Plaintiff Hunt's opposition as evidence of these calls, the Court determined Defendant Hunt's self-made cellphone call log corroborates this observation.  *See Hunt Jr. Interrog. Answers* at 7.

when Plaintiff Hunt asserts that he called Attorney Trudeau to ask about how disclaiming his share of Andrew Hunt's estate would affect the estate's distribution. *Id.* Plaintiff Hunt alleges that Defendant Hunt initiated the vast majority of those calls. *Hunt Sr. Decl.* ¶ 19. The record also includes allegations that Defendant Hunt misrepresented the value of Andrew Hunt's estate as only $5,000.00. *Hunt Sr. Decl.* ¶ 27, but other evidence indicates that conversation occurred in Rhode Island, perhaps even after Plaintiff Hunt signed the disclaimer.[8] *Rigby Decl.* ¶ 13; *Sexton-Brady Decl.* ¶ 14; *Hunt Jr. Interrog. Answers* at 3.

The relatedness question is essentially whether the above contacts are "material" to the claims Plaintiff Hunt brings against Defendant Hunt. *Harlow,* 432 F.3d at 61. The Court concludes that they are. The gravamen of the allegations against Defendant Hunt is that he, through fraud, misrepresentations, and undue influence, cajoled his father into renouncing his status as personal representative and his share of Andrew Hunt's estate. Again, the phone calls are jurisdictional contacts. *Swiss Am. Bank*, 274 F.3d at 622 ("When physical presence is lacking, we look for some other indication that the defendant reached into the forum, such as mail or telephone contacts'). Under *Exeter*, the nature of these contacts is dispositive, not necessarily the lack of Defendant Hunt's physical presence in Maine. 196 F.3d at 289-90 ("[T]o be constitutionally significant, forum-state contacts need not involve

---

[8]    There were another forty-one phone calls between the parties on December 16 and 17, 2019, while Plaintiff Hunt was in Florida on vacation. *Pl.'s Opp'n* at 5. There is no evidence in the record that these contacts are related, for purposes of the personal jurisdiction analysis, to Maine or the underlying causes of action concerning the disclaimer, which Plaintiff Hunt executed several months earlier, in October.

physical presence . . . it is not the relationship itself, but the content of the parties' interactions that creates constitutionally significant contacts"). While it is true that Defendant Hunt was outside Maine when he communicated with his father, the wrongful conduct of undue influence and fraud is repetitive and persistent communication.

Defendant Hunt's conduct is distinguishable from that of Attorney Trudeau. While Attorney Trudeau's three isolated mailings to Maine are ancillary in comparison to her non-forum activities, Defendant Hunt's alleged communications with his father are the wrongful conduct from which the elder Hunt seeks relief. The communication from Defendant Hunt during these calls is the alleged fraud and undue influence. Moreover, the noticeable surge in calls between the parties around the time of key mailings is deemed true for purposes of this motion and supports the inference that Defendant Hunt was attempting to influence Plaintiff Hunt. Thus, this circumstantial evidence permits the Court to conclude, for purposes of this motion, that the calls plausibly related to Defendant Hunt coaxing Plaintiff Hunt to execute the forms. In summary, the Court finds that Plaintiff Hunt has made a prima facie showing of relatedness.

The Court concludes that Plaintiff Hunt has also met his burden on purposeful availment. First, the Court concludes Defendant Hunt's phone calls to Plaintiff Hunt satisfy the voluntariness prong. At this stage, the Court accepts as true Plaintiff Hunt's statement that his son initiated most of these calls. Thus, the alleged contacts are voluntary. Second, the more complex question is whether these contacts make it

such that Defendant Hunt could reasonably foresee that he may be haled into a Maine courtroom as a result of these contacts.  The Court concludes that he could.

On this point, the Court is persuaded that litigation was reasonably foreseeable to Defendant Hunt for two reasons.  First, the volume of his contacts with his father in Maine.  The record reflects that in the months after Andrew Hunt passed away, Plaintiff Hunt and Defendant Hunt exchanged dozens of calls concerning the disposition of his estate.  *Hunt Jr. Interrog. Answers* at 7.  Although not all these calls occurred while Plaintiff Hunt was physically present in Maine, the Court accepts that any calls made while he was outside of the forum were, on the pleadings, part of a continuing effort to obtain Plaintiff Hunt's assent to the disclaimer and renunciation form.

Second, the nature of Defendant Hunt's contacts with his father further supports a finding of foreseeability.  As alleged, Defendant Hunt repeatedly targeted his father in Maine in an attempt to persuade his father to give up his own property rights and transfer a large sum of assets to him and perhaps to his sister.  He allegedly provided direction to his father about how to complete each form and have the forms notarized.  *Hunt Sr. Decl.* ¶ 20.  This relationship and communication were ongoing for several months at the end of 2019.  As such, Defendant Hunt reached into Maine with the intent of extracting a benefit for himself—receiving assets that the Maine man would otherwise possess.  Therefore, Plaintiff Hunt has made a prima facie showing of purposeful availment.

46

Finally, the Court concludes that exercising personal jurisdiction over Defendant Hunt is reasonable. There is evidence in the record suggesting that Defendant Hunt has a medical condition that makes traveling to Maine difficult, but he does not disclose what that condition is. *Hunt Jr. Aff.* ¶ 16. Without more information, the Court cannot precisely address the significance of this factor. Moreover, Defendant Hunt points out that he cares for his elderly mother and that he could not travel to Maine without finding her another caregiver and putting her at risk of COVID-19 exposure. *Id.* ¶ 18. The Court agrees that this factor weighs against personal jurisdiction but believes that such concerns can be ameliorated in the short-term as the District of Maine continues to use videoconference proceedings, particularly in civil cases.

Regarding the other reasonableness factors, the Court concludes that they weigh in favor of personal jurisdiction. Maine has a "manifest interest" in providing a forum for its citizens to recover damages for harms caused by out-of-staters. *See Baskin-Robbins*, 825 F.3d at 40 ("As the Supreme Court has explained, '[a] State generally has a "manifest interest" in providing its resident with a convenient forum for redressing injuries inflicted by out-of-state actors") (citing *Burger King*, 471 U.S. at 473). Moreover, although Massachusetts has a parallel interest in resolving the Hunt family's competing claims to Andrew Hunt's estate, only Maine has an interest in resolving tort claims asserted under Maine law. Thus, the Court concludes that is has personal jurisdiction over Thomas Hunt, Jr.

### B.    The Probate Exception

The Court dismisses Counts I, IV, and V of the amended complaint because they fall within the probate exception to federal jurisdiction.  The remedies Plaintiff Hunt seeks in those counts would undermine the Massachusetts probate court's control over the estate's res.  Thus, the probate exception prevents the Court from exercising jurisdiction over these counts.

By statute, Congress has given the federal courts subject matter jurisdiction over civil actions between citizens of different states when the amount in controversy exceeds $75,000.  28 U.S.C. § 1332.  The judge-made probate exception hollows out a small portion of this jurisdiction.  *Jiménez v. Rodríguez-Pagán*, 597 F.3d 18, 23 (1st Cir. 2010) ("It has been said that [t]he probate exception is one of the most mysterious and esoteric branches of the law of federal jurisdiction.  Once more unto the breach") (internal citations omitted).

Federal courts lack subject matter jurisdiction over pure probate matters. *Markham v. Allen*, 326 U.S. 490, 494 (1946).  "[A] federal court has no jurisdiction to probate a will or administer an estate[.]"  *Id.*  However, the probate exception is deep, not broad; it does not render all litigation involving an estate non-justiciable in federal court.  *Id.*  On the contrary, "federal courts . . . have jurisdiction to entertain suits 'in favor of creditors, legatees and he[ir]s' and other claimants against a decedent's estate 'to establish their claims' so long as the federal court does not interfere with the probate proceedings or assume general jurisdiction of the probate or control of the property in the custody of the state court."  *Id.* (citing *Waterman v.*

*Canal-Louisiana Bank & Trust Co.*, 215 U.S. 33, 43 (1909)).  As a result, a federal court "may exercise its jurisdiction to adjudicate rights in [property in the custody of a state court] where the final judgment . . . does not interfere with the state court's possession save to the extent that the state court is bound by the judgment to recognize the right adjudicated by the federal court."  *Id.* at 494.

The United States Supreme Court once acknowledged that the *Markham* rule "is not a model of clear statement."  *Marshall v. Marshall*, 547 U.S. 293, 310 (2006).  So, the Supreme Court clarified it.  *Id.* at 311.  The exception imposes two limits on federal jurisdiction.  *Id.* at 311-12.  First, "the probate or annulment of a will and the administration of a decedent's estate" is reserved to state probate courts.  *Id.* at 311.  Second, federal courts cannot "endeavor[] to dispose of property that is in the custody of a state probate court."  *Id.* at 312.  Outside these two areas, federal jurisdiction obtains.  *See id.* (noting that the probate exception "does not bar federal courts from adjudicating matters outside those confines and otherwise within federal jurisdiction").

Caselaw further clarifies the rule.  In *Markham*, the Supreme Court held that a federal court may determine an individual's right to estate proceeds, but it may not distribute those proceeds.  326 U.S. at 494-95 (finding the probate exception did not apply when the district court's judgment only allowed a claimant to recover from an estate after the state probate action had concluded).  Moreover, in *Marshall*, a woman filed for Chapter 11 bankruptcy while a state court was probating her deceased husband's vast estate.  547 U.S. at 300-01.  The decedent's son filed a proof of claim

against the woman for defamation in the bankruptcy proceeding. *Id.* at 300-01. The woman counterclaimed, including a claim for tortious interference with a gift that she expected from her husband's estate following his death. *Id.* at 301. She obtained summary judgment from the bankruptcy court, which resulted in $449 million in compensatory damages, less whatever she recovered in the parallel probate proceeding, and $25 million in punitive damages. *Id.*

The decedent's son attempted to have the district court vacate this judgment on the basis of the probate exception. *Id.* at 302. The district court refused to do so, reasoning that deciding the counterclaim would not unduly disrupt the probate proceedings because (1) adjudicating the counterclaim would not require invalidating the decedent's will and (2) state court jurisdiction over a tortious interference claim was non-exclusive. *Id.* The Ninth Circuit reversed, relying on an expansive understanding of the probate exception. *Id.* at 304 (citing *In re Marshall*, 392 F.3d 1118, 1133 (9th Cir. 2004)).

The Supreme Court reversed the Ninth Circuit, agreeing with the district court that the probate exception did not apply. *Id.* at 312. As the Supreme Court explained, the exception was inapplicable because the counterclaimant sought an in personam judgment on a tort claim, but did not attempt to probate or annul her deceased husband's will. *Id.* Moreover, the counterclaimant did not seek to recover from the estate res, which was in the custody of the state probate court. *Id.*

In *Jiménez v. Rodríguez-Pagán*, 597 F.3d 18, 24 (1st Cir. 2010) the First Circuit considered the probate exception after *Marshall*. There, the First Circuit concluded

the exception did not extend to an action by a decedent's widow to recover proceeds owed to her deceased husband's estate and to exercise an option to purchase an apartment that the husband had allegedly reserved. *Id.* at 22-24. Favorably citing *Lefkowitz v. Bank of N.Y.*, 528 F.3d 102, 106 (2d Cir. 2007),[9] the First Circuit reasoned the exception did not apply because neither the proceeds nor the option was "yet part of the decedent's estate" and "neither [were] yet in custody of a Puerto Rico probate court." In fact, "the very relief sought . . . [was] enlargement of the decedent's estate through assets not currently within it." *Id.*

To summarize, the probate exception provides two distinct limits on federal jurisdiction. The core probate exception "reserves to state probate courts the probate or annulment of a will and the administration of a decedent's estate." *Marshall*, 547 U.S. at 311. The second exception is "essentially a reiteration of the general principle that, when one court is exercising *in rem* jurisdiction over a *res*, a second court will not assume *in rem* jurisdiction over the same *res*." *Id.* at 311. It precludes federal courts from endeavoring to dispose of property that is in the custody of a state probate court." *Id.* at 312.

Mr. Hunt, Sr. contends that this second form of the probate exception only applies to proceedings in rem and not actions in personam like his own. *Pl.'s Opp'n* at 32. The Court disagrees. When determining whether the probate exception

---

[9]     Though not binding authority, the Court finds *Lefkowitz* highly persuasive and applicable to the facts of this case. There, the Second Circuit dismissed claims which would have required the federal district court to assert control over property in the custody of a state probate court. 528 F.3d at 107-108. At the same time, the Second Circuit concluded that in personam claims for breach of fiduciary duty and other torts seeking personal damages from the defendants, rather than distributions from the estate, were not within the scope of the probate exception and could proceed in federal court. *Id.*

applies, the dispositive question is whether the plaintiff requests that the federal court wrench control over the estate away from the state court. *Id.*; *Jiménez*, 597 F.3d at 24. In short, the relief requested dictates whether the probate exception applies, rather than the formal category of the underlying cause of action.

The contrast between Counts I and II help explain this distinction. Both assert claims under Maine's Improvident Transfer of Title Act. *Am. Compl.* ¶¶ 73-89. In Count I, Plaintiff Hunt demands that the Court "void the Disclaimer," namely the form now filed in Massachusetts Probate Court. *Id.* This strikes the Court as asking that it interfere in a manner contrary to *Marshall* in the Probate Court's administration of the probate proceeding before it. By contrast, in Count II, Plaintiff Hunt seeks damages against Defendant Hunt personally for his alleged violation of the Improvident Transfer of Title Act. *Id.* This allegation and relief do not implicate either the administration of the probate proceeding or the res of the Estate under the control of the Probate Court.

Based on this analysis, Counts II, III, VI, VII, and VIII of the Amended Complaint are not subject to the probate exception. Plaintiff Hunt asserts these claims in personam under Maine tort law against Defendant Hunt, Attorney Trudeau, or both defendants. Count II seeks damages under Maine's Improvident Transfer of Title Act, Count III seeks damages for wrongful interference with an expectancy, Count VI seeks damages and exemplary damages for fraud, Count VII seeks damages for breach of fiduciary duty against Defendant Hunt, Count VIII seeks damages for breach of fiduciary duty against Attorney Trudeau. *Am. Compl.* ¶¶ 82-

89, 90-93, 104-16. As in *Marshall*, these tort claims do not implicate the probate exception because they neither (1) require the Court to administer or probate an estate or annul a will nor (2) compel the Court to exercise jurisdiction over property in state court custody.

Counts I, IV, and V are different. As noted earlier, Count I demands that the Court void the estate disclaimer that Mr. Hunt, Sr. signed. *Am. Compl.* ¶¶ 75-81. The Court concludes that this claim falls within the probate exception. The probate exception bars federal courts from annulling wills. *Marshall*, 547 U.S. at 311. However, Andrew Hunt died without a will and therefore his estate will pass through the laws of intestacy. As such, the parental disclaimers Plaintiff Hunt and Elaine Hunt signed are the dispositive documents governing how the probate court will distribute Andrew Hunt's estate. Thus, the same principles within the probate exception that precludes a federal court from voiding a will apply. Moreover, Plaintiff Hunt is also seeking to rescind his disclaimer in proceedings before the Massachusetts probate court. *Trudeau Reply*, Attach. 1, *Estate of Andrew David Hunt, Docket No. SU19P2044* at 1. Thus, adjudicating the rescission claim would effectively administer the estate simultaneously with the Commonwealth of Massachusetts in violation of the probate exception. The Court's concerns about wrongfully administering the estate are heightened in a case like this where, Jennifer Hunt and Elaine Hunt, two potential beneficiaries of the estate, are not parties to this action.

Counts IV and V request a constructive trust over Plaintiff Hunt's purported share of the estate. *Id.* ¶¶ 94-103. Together, these counts request that the Court take control of half of the estate, setting it aside for Plaintiff Hunt. This violates the probate exception's second prohibition because the estate corpus is currently under the control of the Commonwealth of Massachusetts.

Accordingly, the Court dismisses Counts I, IV, and V for lack of federal subject matter jurisdiction. The Court also dismisses the remaining counts to the extent that Plaintiff Hunt seeks to compel the Court to disburse a portion of the estate to him during the life of the probate action.

### C. *Colorado River* Abstention

Having dispensed with the claims that would require the Court to exercise jurisdiction over the res of Andrew Hunt's estate, the Court now considers whether *Colorado River* abstention applies.

In certain circumstances, a federal court may invoke abstention to avoid duplicative litigation. *See Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) (explaining that the interests of "wise judicial administration," conserving "judicial resources," and "comprehensive disposition of litigation" can weigh in favor of abstention to prevent duplicative litigation). Abstention is the exception and not the norm. *See Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 73 (2013) ("We have cautioned, however, that federal courts ordinarily should entertain and resolve on the merits an action within the scope of a jurisdictional grant . . .").

As the First Circuit stated in *Jiménez*, "[t]he crevice in federal jurisdiction that *Colorado River* carved is a narrow one." *Id.*

"[T]he presence of parallel litigation in state court will not in and of itself merit abstention in federal court." *Id.* *Colorado River* provides for abstention only in "exceptional circumstances." *Id.* Though exceptional, these circumstances exist. *Id.* at 28 (citing *Rivera-Feliciano v. Acevedo-Vilá*, 438 F.3d 50 (1st Cir. 2006); *Currie v. Group Ins. Comm'n*, 290 F.3d 1 (1st Cir. 2002); *Liberty Mut. Ins. Co. v. Foremost-McKesson, Inc.*, 751 F.2d 475 (1st Cir. 1985)).

The First Circuit identified at least eight factors that a federal court should assess when deciding whether *Colorado River* abstention is proper. *Id.* at 27-28 (quoting *Rio Grande Cmty. Health Ctr. v. Rullan*, 397 F.3d 56, 71-72 (1st Cir. 2005)). They are:

> (1) whether either court has assumed jurisdiction over a res; (2) the [geographical] inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether state or federal law controls; (6) the adequacy of the state forum to protect the parties' interests; (7) the vexatious or contrived nature of the federal claim; and (8) respect for the principles underlying removal jurisdiction.

*Id.* (citing *Rio Grande*, 397 F.3d at 71-72). Deciding whether these factors merit abstention is not as easy as running through a checklist, and "no one factor is necessarily determinative." *Id.* at 28. The Court must balance the above factors. *Id.* There is a presumption in favor of exercising federal jurisdiction. *Id.* (citing *Rivera-Feliciano v. Acevedo-Vilá*, 438 F.3d 50 (1st Cir. 2006)).

The first *Colorado River* factor is critical to the Court's decision. This action, and the related probate court action contain claims that arise quasi in rem and in personam.[10] Andrew Hunt's estate is a res, and the parties have competing claims to the res. That res is currently in the custody of a probate court in Suffolk County, Massachusetts, and the res contains real property—Andrew Hunt's condominium in Boston. It is axiomatic that when one court has custody of property through proceedings in rem or quasi in rem "the state or federal court having custody of such property has exclusive jurisdiction to proceed." *Donovan v. City of Dallas*, 377 U.S. 408, 412 (1964) (citing *Princess Lida of Thurn and Taxis v. Thompson*, 305 U.S. 456, 465-68 (1939)); *see also* ERWIN CHEMERINSKY, FEDERAL JURISDICTION 900 (6th ed. 2012) ("[T]here is a clear rule preventing duplicative proceedings in cases involving real property: the court that acquires jurisdiction first decides the matter").

*Colorado River* abstention might well apply if the Court had not dismissed Counts I, IV, and V, which arose quasi in rem, under the probate exception. The pragmatic concerns about judicial efficiency and respect for our nation's system of federalism embodied in *Donovan* and *Princess Lida* shape the Court's *Colorado River* analysis. Inconsistent federal and state judgments would pose an even greater risk of harm here than they did in *Jiménez*. This res contains real property, while *Jiménez* only concerned an option to purchase real property. Thus, the risk of inconsistent

---

[10]     As the Supreme Court explained, "[a] judgment in personam imposes a personal liability or obligation on one person in favor of another" while "[a] judgment quasi in rem affects the interests of particular persons in designated property." *Hanson v. Denckla*, 357 U.S. 235, 246 n.12 (1958). Because this action and the probate action seek to adjudicate the rights of various persons to a fixed pot of assets, i.e., Andrew Hunt's estate, they are quasi in rem actions, but the action does contain in personam tort claims against both defendants.

judgments of the parties' rights to Andrew Hunt's estate would strongly favor of abstention. However, the Court dismissed the counts of the Amended Complaint that would raise the risk of inconsistent judgments. All that remains is in personam tort claims against Defendant Hunt. These claims, as the Court construes them, seek recovery directly from Defendant Hunt, not from the estate. Thus, this factor weighs against abstention given the current posture of this case.

Without the risk of inconsistent judgments concerning property rights in Andrew Hunt's estate, there is little reason to refrain from exercising jurisdiction over the tort claims. The remaining factors either weigh against abstention or are neutral. First, Maine is not an unduly inconvenient forum as both the remaining parties are in New England. Second, the Court views the risk of piecemeal litigation as minimal. Because the Court lacks personal jurisdiction over Attorney Trudeau, there is no risk of conflicting judgments as to her performance of fiduciary duties or administration of the estate. Third, though Massachusetts obtained jurisdiction first, the parties have not shown that the probate action has progressed appreciably beyond this case. Fourth, the claims in the federal case concern settled issues of state law and therefore weigh against abstention. Fifth, the probate court is potentially an inadequate forum for Plaintiff Hunt to raise his claims under the Maine Improvident Transfer of Title Act. Moreover, Massachusetts does not permit parties to recover tort damages in probate proceedings. *Siegemund v. Shapland*, 247 F. Supp. 2d 1, 9-10 (D. Me. 2003) (citing *Heacock v. Heacock*, 520 N.E.2d 151, 153 (Mass. 1988)). However, it appears that, in Massachusetts, parties can sue a personal representative

in probate court for neglect or maladministration of an estate.  Mass. Gen. Laws. Ch. 205, § 31.  The remaining *Colorado River* factors do not apply to this case.

On balance, the Court concludes that *Colorado River* abstention is improper. Dismissing Counts I, IV, and V of the Amended Complaint greatly alleviates the risk of conflict between the state and federal system should this parallel litigation continue.  With them, the Court would conclude that the state and federal actions were on a potential collision course toward inconsistent determinations of property rights.  Without them, this is a run-of-the-mill diversity case, which alleges claims under Maine tort law.  Thus, the exceptional circumstances that justify abstention under *Colorado River* are not present.

### D.   *Younger* Abstention

For similar reasons, the Court concludes that abstention under *Younger* is also inappropriate.  *Younger* abstention applies in three types of cases: (1) federal intrusion into state criminal prosecutions, (2) state civil enforcement proceedings that are analogous to criminal prosecutions, and (3) federal cases "interfering with pending 'civil proceedings involving certain orders . . . uniquely in furtherance of the state courts' ability to perform their judicial functions."  *Sprint Commc'ns*, 571 U.S. at 78.  This case potentially implicates only the final category.

As the First Circuit has remarked, "*Younger* applies only when the relief asked of the federal court 'interfere[s]' with the state proceedings."  *Rio Grande*, 397 F.3d at 70.  "Interference is . . . usually expressed as a proceeding that either enjoins a state proceeding or has the 'practical effect' of doing so."  *Id.*  Once again, there is no

risk of that here.  The Court lacks personal jurisdiction over Attorney Trudeau so there is no risk of conflicting rulings by the Court and the probate court about whether she breached her fiduciary duties as personal representative of Andrew Hunt's estate.  Moreover, as discussed, the Court lacks subject matter jurisdiction over claims that would require it to control or make disbursements from the estate in state custody.  Given this, *Younger* abstention is inappropriate.

## VI.   CONCLUSION

The Court concludes that it lacks personal jurisdiction over Attorney Jane Trudeau but has personal jurisdiction over Thomas Hunt, Jr.  The Court further concludes that it lacks subject matter jurisdiction over Counts I, IV, and V of the Amended Complaint because of the probate exception to federal jurisdiction. Because these dismissals make abstention improper, the Court does not abstain under *Younger* or *Colorado River*.

It is therefore ORDERED that:

1.   The Court GRANTS Jane Trudeau's Motion to Dismiss Pursuant to Fed. R. Civ. 12(b)(1) and (2) (ECF No. 14) because the Court lacks personal jurisdiction over Attorney Trudeau.  The Court therefore DISMISSES without prejudice Counts I-VIII of the Amended Complaint as against Defendant Jane Trudeau (ECF No. 1-1).

2.   The Court DENIES in part Thomas W. Hunt, Jr.'s Motion to Dismiss (ECF No. 26) on the basis of personal jurisdiction.

3.   The Court GRANTS in part and DENIES in part Thomas W. Hunt, Jr.'s Motion to Dismiss (ECF No. 26).  The Court DISMISSES without prejudice Counts I, IV, and V of the Amended Complaint (ECF No. 1-1) based on the probate exception and the Court DISMISSES without prejudice Counts   II, III, VI, VII and VIII but only to the extent Thomas Hunt, Sr. seeks damages directly from the estate of Andrew

Hunt and only while the parallel Massachusetts probate action is pending.

SO ORDERED.

<u>/s/ John A. Woodcock, Jr.</u>
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 29th day of December, 2020